## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DARREN WILSON,                    )
                                 )
                Plaintiff,        )
                                 )
vs.                              )        Case No. 3:20-cv-00141-GCS
                                 )
PERCY MYERS,                      )
CHRISTINE BROWN,                  )
and                              )
ROB JEFFREYS,                     )
                                 )
                Defendants.

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Pending before the Court are Defendants' motions for summary judgment. (Doc. 65, 66, 68, 69, 78).[1] Plaintiff opposes the motions. (Doc. 74, 75). Based on the following, the Court **GRANTS** the motions for summary judgment.

Plaintiff Darren Wilson, an inmate currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), alleges that Defendants were deliberately indifferent to his serious medical needs in treating injuries to both of his knees and refusing to provide him with a knee brace. He seeks declaratory judgment, monetary damages, and injunctive relief. Plaintiff makes the following allegations in his complaint:

---

[1]        Along with the motions for summary judgment, Defendants filed the required Federal Rule of Civil Procedure 56 notice informing Plaintiff of the consequences of failing to respond to the motions for summary judgment and what is required in responding to a motion for summary judgment. (Doc. 67, 70).

On September 5, 2018, Plaintiff injured his left knee. He saw Dr. Myers for the injury, and an x-ray was ordered. The x-ray confirmed a broken knee. Despite being diagnosed with a broken knee, Dr. Myers refused to follow-up on the injury and denied Plaintiff medical treatment for the injury. (Doc. 1, p. 5). A nurse practitioner later ordered an MRI for Plaintiff's knee, which Dr. Myers canceled. Plaintiff also alleges that Christine Brown was deliberately indifferent in treating his left knee by lying and telling Plaintiff that he would be seen by a specialist. She also told Plaintiff that he was approved for surgery and would receive physical therapy, but those procedures had been approved for his right knee, not his left. *Id*.

Plaintiff also alleges that he received improper treatment for injuries to his right knee. He alleges that Dr. Garcia initially refused to send him to a specialist. (Doc. 1, p. 8). In June 2018, he received physical therapy, but he could not bend his knee due to it being displaced. The physical therapist also informed Dr. Myers that he should consider sending Plaintiff to a surgeon. *Id*. at p. 9. The surgeon found that Plaintiff had complications with his right knee since 2009. Plaintiff was unable to bend his knee or leg, and as a result, surgical options were limited. He was referred to a knee reconstruction specialist, but the specialist found that surgery would not be helpful at because the knee went untreated for ten years. *Id*. The surgeon later wrote back indicating that she would provide Plaintiff with another medical opinion, but he has been refused a referral back to the surgeon. *Id*. at p. 10. On March 30, 2019, Plaintiff fell, but Dr. Myers refused to provide him any treatment for the knee. *Id*. at p. 9.

Plaintiff also alleges that he is a qualified individual with a disability and was previously prescribed an immobilizer knee brace for his right knee. That brace was taken away from him in 2009, and he has tried to obtain another one from 2009 to 2019 to no avail. Because Plaintiff does not have access to a knee brace, he has fallen and injured himself on numerous occasions. Plaintiff notes that he has now received the knee brace, but he went without such a brace for several years because the Defendants improperly denied his request for one. (Doc. 1, p. 13).

On April 6, 2020, the Court conducted a threshold review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915A. Plaintiff was allowed to proceed with two counts of deliberate indifference in violation of the Eight Amendment: Count 1 against Brown and Dr. Myers regarding the treatment Plaintiff received for the injury to his left knee; and Count 2 against Dr. Myers and Dr. Garcia regarding the treatment Plaintiff received for the injury to his right knee. Plaintiff was also allowed to proceed in Count 3 against Rob Jeffreys, in his official capacity only, on a claim pursuant to the Americans with Disabilities Act ("ADA") and/or Rehabilitation Act ("RA") due to the fact that the facility took away and refused to replace his immobilizer knee brace. (Doc. 9).[2]

Both Defendants Myers and Brown maintain that they are entitled to summary judgment as Plaintiff cannot set forth any evidence that they were deliberately indifferent to his serious medical needs in treating his knees. Specifically, Defendant Myers contends that the records clearly show that the injury to Plaintiff's left knee did not constitute a

---

[2]     On August 26, 2020, the Court granted Plaintiff's motion to dismiss Defendant Dr. Hector Garcia from the lawsuit. (Doc. 49).

serious medical need and that his treatment of the left knee was appropriate. As to the right knee, Defendant Myers contends that he ordered x-rays, prescribed pain medications, and referred Plaintiff to orthopedic surgical evaluations. Once it was determined that Plaintiff was not a surgical candidate for his right knee, Defendant Myers continued to provide conservative treatment. Likewise, Defendant Brown argues that Plaintiff received continued medical treatment for his left knee. Additionally, Brown did not provide medical assistance as part of her job responsibilities, and she was not able to order a particular treatment for any inmate.

Defendant Jeffreys also maintains that he is entitled to summary judgment as Plaintiff cannot establish that he was denied reasonable accommodations related to his alleged disability. The evidence shows that his use of an immobilizer brace was discontinued by medical staff upon his transfer to Pinckneyville.

Plaintiff counters that the evidence shows that Defendants Myers and Brown were deliberately indifferent to his serious medical needs. Plaintiff further notes that his need for the immobilizer is based on a serious medical condition regarding his knee.

## FACTS

The following facts are taken from the record and presented in the light most favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

During the relevant times alleged in the complaint, Plaintiff was housed in Pinckneyville.[3]

Defendant Christine Brown, a registered nurse, was the Health Care Unit Administrator ("HCUA") at Pinckneyville. Defendant Brown's responsibilities as the HCUA are to direct, coordinate, and review the activities of the healthcare operations in conjunction with the Medical Director and the Nursing Director. Defendant Brown does not treat patients in her administrative role; nor does she make decisions regarding the medical care of prisoners. In reviewing medical and ADA related grievances, it was customary for Defendant Brown to review an inmate's medical chart and Medication Administration Record ("MAR"). Defendant Brown would also speak with the Director of Nursing and the Pharmacy Technician, or housing unit officer depending on the issue grieved. As to Plaintiff's medical care grievances, Defendant Brown would have reviewed Plaintiff's chart and the MAR. (Doc. 73). She also would have spoken with the Director of Nursing and the Pharmacy Technician before providing a response to the grievance officer. *Id.*

Since June 13, 2018, Defendant Dr. Percy Myers was employed as the Medical Director at Pinckneyville. From May 23, 2017 to June 12, 2018, Myers was an independent contractor working as a physician at Pinckneyville.

Prior to his arrival at Pinckneyville, on March 27, 2017, Plaintiff had x-rays performed on both knees. The impression of the x-rays of the left knee was unremarkable,

---

[3]     Plaintiff has been incarcerated with the IDOC since 1992. He was transferred to Pinckneyville on May 2, 2018.

and the right knee had a post-operative appearance with stable elevation of the right patella. Additionally, on April 26, 2018, Plaintiff had an x-ray of his left knee due to a self-reported injury that occurred on March 26, 2018. This x-ray revealed mild tricompartmental osteoarthritis of the knee joint with a small joint infusion (swelling).

On May 3, 2018, Dr. Butalid examined Plaintiff and noted that he had a history of right knee surgeries in 2008 and 2009, that his left knee could flex 100 degrees, that his right knee had healed midline scar tissue, and that he was not able to bend his right knee. Dr. Butalid issued Plaintiff an indefinite knee/sleeve brace x2 permit and a one-year permit for low bunk, low gallery, in addition to a cane and shower chair permits for one year.

On May 24, 2018, a Registered Nurse ("RN") saw Plaintiff at Nurse Sick Call ("NSC") for complaints of numbness in his legs. Plaintiff reported that he had chronic pain for years, and the nurse noted he walked with a cane. The nurse also noted that Plaintiff had a current order for Ultram. As such, she did not provide him with over the counter pain medications, and she referred him to a physician.

Thereafter on May 30, 2018, an RN saw Plaintiff after he fell in his cell that evening. Plaintiff complained of a 10/10 pain level in his right knee. The RN observed minimal swelling and a contusion. Plaintiff was also unable to bend his knee. The RN contacted Dr. Butalid. Dr. Butalid ordered an x-ray, Motrin 400 mg to be taken twice a day as needed for 10 days, ice for 24 hours, and a follow-up in a week.

Two days later, Plaintiff saw Defendant Myers. Plaintiff reported that his right leg would go numb and did not bend. He also reported that he had fallen several times and

that he had done physical therapy ("PT") since 2009. He also stated that after his surgeries, he has had knee instability and pain and could only bend his knee 30 degrees. Defendant Myers examined Plaintiff and noted a healed surgical scar and that his right knee had decreased flexibility. Defendant Myers reviewed Plaintiff's 2017 x-rays. Defendant Myers assessed that Plaintiff had a fused right knee with decreased strength and increased instability. Defendant Myers ordered that Plaintiff: (1) be enrolled in the asthma chronic clinic; (2) take part in PT evaluation and treatment for imbalance and muscle weakness; (3) apply a muscle rub to the knee daily for 6 months; (4) apply Eucerin cream daily after shower to his knees for 6 months; (5) take Ultram 50 mg twice a day for 3 months; (6) be permitted to wear orthopedic shoes; (7) be allowed to wear a back brace; and (8) have a PA/lateral x-ray of his right knee. (Doc. 66-3, p. 19-20).

On June 4, 2018, the x-ray of the right knee was performed. It showed two metallic screws within the patella with fragmentation of the inferior border of the patella and ossification (process of bone formation) of the patellar tendon. It also showed that the patella was slightly high riding with a loss of lateral joint space. The x-ray did not show loose body, and there was no convincing evidence of an acute bony fracture. It was noted that the findings were likely post traumatic or post-operative in nature.

Physical Therapist Dan Varel evaluated both of Plaintiff's knees on June 11, 2018. Varel recommended PT 2-3 times a week for 6 weeks to improve right knee range motion, as well as strengthening and balance. He noted, however, that the potential for improvement was poor. Varel also noted that an orthopedic consultation may be considered to see if anything else could be done. *Id.* at p. 22, 173.

Additionally, Plaintiff saw a Licensed Practical Nurse ("LPN") in NSC for complaints of left shoulder and left knee pain on June 20, 2018. The LPN observed a knot on the left kneecap and that Plaintiff could not bend his left knee. The LPN referred Plaintiff to a physician.

On July 12, 2018, Plaintiff was seen by Defendant Brown for ADA accommodations. Plaintiff stated that he was okay in his cell, that he could use the shelf to get off the toilet, and that he did not want to go to a four-man wheelchair cell. Defendant Brown informed Plaintiff that only the wheelchair cells have handles on the walls for assistance with the restroom. She noted that Plaintiff ambulated down the hall with a steady gait, climbed on the exam table without difficulty, and moved his hands and legs without difficulty. *Id.* at p. 30-31.

Two days later Plaintiff saw Dr. Caldwell complaining about a frozen right knee with pain in his left knee. Dr. Caldwell ordered Plaintiff to follow-up with Defendant Myers and recommended relocating Plaintiff to an ADA cell. Two days later, Plaintiff saw an LPN in NSC complaining of left knee pain and buckling in the knee when he raised off of the toilet. The LPN observed a knot below the kneecap and noted that Plaintiff was already scheduled for a follow-up with the doctor. The LPN gave Plaintiff Acetaminophen. *Id.* at p. 32.

A week later, Plaintiff saw PT Varel for a 6-week re-evaluation. Varel observed improvements in his range of motion, strength, and balance. Varel recommended continued PT twice a week for 6-8 weeks for progressive strength, range of motion, stretching, and balance activities. *Id.* at p. 36, 174.

Next, Plaintiff saw Nurse Practitioner ("NP") Dearmond because he injured his back and right hand after falling off the toilet. Plaintiff stated he needed an ADA "helper" to assist him.  NP Dearmond ordered x-rays of his lumbar spine and right hand, referred him to PT, and scheduled a follow-up. *Id*. at p. 40, 41.

On August 4, 2018, Plaintiff saw an LPN and requested to be moved to an ADA cell. The LPN completed the Physically Challenged Request Form. That same day, Plaintiff also saw a nurse after reporting that he fell off the toilet. He fell off after he had broken a piece of the shelf he had used to help him get up. The nurse noted abrasions around the right kneecap, but there was no pain upon palpation of the knee. *Id*. at p. 44, 45.

The next day, Plaintiff saw a nurse for complaints of left knee pain. The nurse observed mild swelling, bruising, and old surgery scars. The nurse referred him to the doctor. *Id*. at p. 46.

On August 7, 2018, Plaintiff saw a nurse in NSC for complaints of right knee pain. He stated that his ADA shower was taken away and that he needed an ADA shower and cell. *Id*. at p. 47. Also, on August 7, 2018, Plaintiff saw a physical therapy assistant ("PTA") who noted that he had no trouble using a standard walker to go from sitting to standing; he also had no difficulty using a quad cane for the same thing and for ambulating. *Id*. at. p. 48, 50. On August 8, 2018, Defendant Myers issued Plaintiff a standard walker to use when using the restroom until February 8, 2019.

On August 21, 2018, Plaintiff was seen by an LPN for complaints of left knee pain. The LPN noted a bump below the kneecap and that Plaintiff was very argumentative.

Plaintiff reported that the buckled and that this was not addressed when he was referred to the physician. *Id*. at p. 58.

Plaintiff saw NP Dearmond on September 5, 2018 for medication renewal. NP Dearmond prescribed Tramadol 50 mg to be taken twice a day for three months. *Id*. at p. 64.

Plaintiff injured his left knee on September 5, 2018, when he tripped over the shower lip. He saw Defendant Myers for the injury the next day. Defendant Myers ordered an x-ray of the left knee and directed him to return to the clinic PRN. At that time, Plaintiff was taking Ultram for pain. Plaintiff also saw the PTA on September 6, 2018 and complained of left knee pain. *Id*. at p. 67.

Plaintiff's September 7, 2018 x-ray of his left knee revealed a small joint effusion and a tiny bone fragment in the lateral joint space which could have represented a tiny avulsion fracture. It also revealed that the bony alignment remained normal. The report recommended follow-up. *Id*. p. 68, 283.[4]

At this time, Defendant Myers's medical opinion was that Plaintiff did not require any further diagnostic testing or specialist evaluation for his left knee. (Doc. 66-2, p. 7).

---

[4]     "Treatment of an avulsion fracture typically includes resting and icing the affected area, followed by controlled exercises that help restore range of motion, improve muscle strength and promote bone healing. Most avulsion fractures heal very well without surgical intervention. An avulsion fracture occurs when a small chunk of bone attached to a tendon or ligament gets pulled away from the main part of the bone. … In rare cases, if the bone fragment and main bone are too far apart to fuse naturally, surgery may be necessary to reunite them." https://www.mayoclinic.org/avulsion-fracture/expert-answers/faq-20058520

On September 17, 2018, PT Varel recommended that PT be discontinued because it provided no further benefit for Plaintiff's right knee. He further recommended that Plaintiff continue the home exercise plan and consider an orthopedic consultation for his right knee due to persistent gait impairment and falls. (Doc. 66-3, p. 71, 175). That same day, Plaintiff saw Defendant Myers for complaints of several falls due to difficulty in ambulating. Defendant Myers noted that Plaintiff previously had PT but due to decreased flexion, PT could no longer contribute to Plaintiff's care. Defendant Myers referred Plaintiff to Collegial Review and noted that he was scheduled for consultation on October 1, 2018. *Id*. at p. 72, 74, 176, 178.

Plaintiff was seen by an outside orthopedic surgeon Dr. JT Davis at the Orthopedic Institute of Southern Illinois on October 1, 2018. Dr. Davis x-rayed both knees and determined that Plaintiff had patella alta, arthrofibrosis, and extensor mechanism disruption. Dr. Davis discussed the diagnosis, imaging studies, and treatment options in detail with Plaintiff, including both surgical and non-surgical options. Dr. Davis noted that Plaintiff had limited operative options, including potential extensor mechanism reconstruction or positive or negative joint arthroplasty. Dr. Davis informed Plaintiff that those operations were not something within his area of expertise and recommended that Plaintiff see the knee reconstructive specialist in Springfield where he had his initial surgery. Dr. Davis did not document any issues with Plaintiff's left knee. *Id*. at p. 180-186; (Doc. 66-2, p. 8). Plaintiff testified that Dr. Davis told him he had limited surgical options and that it was not in his area of expertise to perform that type of surgery. (Doc. 63-1, p. 61, 62).

Defendant Myers saw Plaintiff on October 5, 2018. He referred Plaintiff to Collegial Review for a consultation with a knee reconstructive specialist. *Id*. at 80, 189.

On October 8, 2018, Plaintiff saw an LPN in NSC for complaints of left shoulder and left knee discomfort. Plaintiff stated he injured his knee on September 5, 2018 when he fell in the shower. The x-ray showed he had a fracture. The LPN noted that Plaintiff was walking with a cane and had a steady gait. He was also able to move his knee without difficulty. *Id*. at p. 81.

On October 11, 2018, Collegial Review approved Plaintiff for an evaluation with an outside knee specialist. *Id*. at p. 82.

The next day, Defendant Myers saw Plaintiff for complaints of pain to his knee and shoulder. Defendant Myers ordered Plaintiff to have an ADA shower and extra-large compression socks. He also prescribed Naprosyn 500 mg to be taken twice daily for six months, as well as hydrocortisone for eight months. *Id*. at p. 83.

On October 15, 2018, grievance officer, C. Hale, responded to a grievance filed by Plaintiff stating: "Per HCUA: He has seen the MD for his knee and also seen the Ortho specialist on 10/4/2018. There is no need to shower in the HCU as it has a lip on it also so water does not go everywhere. He has approval to see another specialist for his knee. He was seen by PT and given exercises to do. He was re-evaluated by the therapist on 9-17-18 and felt no further PT medically indicated at this time." (Doc. 75, p. 15).

Similarly, on October 17, 2018, S. Mercier, counselor, responded to Plaintiff's September 5, 2018 grievance stating: "Per HCUA: He has seen the MD for his knee and also seen the Ortho specialist on 10/4/2018. There is no need to shower in the HCU as it

has a lip on it also so water does not go everywhere. He has approval to see another specialist for his knee. He was seen by PT and given exercises to do. He was re-evaluated by the therapist on 9-17-18 and felt no further PT medically indicated at this time." *Id.* at p. 11.

Next on October 29, 2018, grievance officer, C. Hale, responded to one of Plaintiff's grievances stating: "Per HCUA, he was seen by MD on 10/12/2018 and all his meds were reviewed. When he saw the nurse on 10/20/18 there was no change in his condition and he was just seen 8 days prior. The nurse did not refer him on the 20th. He is also being seen by Physical Therapy for home exercise and teaching him to help with his pain. The copay is the law and is for the nurse visit not the MD." *Id.* at p. 13.

In November 2018, the Medical Furlough Clerk noted that she spoke with Dr. Davis's nurse to let her know that Plaintiff could not be sent to Springfield SIU School of Medicine. This is because the facility did not have any orthopedic doctors at the time. The Medical Furlough Clerk asked Dr. Davis to refer him elsewhere, but Dr. Davis's nurse told the Medical Furlough Clerk to send Plaintiff to Springfield SIU School of Medicine. (Doc. 63-3, p. 98).

On December 3, 2018, NP Dearmond saw Plaintiff for complaints of left knee pain. NP Dearmond noted that Plaintiff walked with a cane and that his left knee showed no visible swelling or redness. NP Dearmond prescribed a muscle rub to the affected area for 6 months and referred him to Collegial Review for an MRI of the left knee.

The following day, NP Dearmond noted that she spoke with Defendant Myers regarding the left knee x-ray results from September 2018. NP Dearmond canceled the

MRI referral and ordered another left knee x-ray in January 2019 to see if there were any changes prior to ordering further testing. *Id*. at p. 102.

Thereafter, on December 13, 2018, Defendant Myers noted that no orthopedic surgeons in the vicinity would accept Plaintiff. He further noted the need to contact the Wexford Regional Medical Director to discuss a transfer for Plaintiff to a facility near the University of Illinois for a surgical evaluation. Also, that day, Defendant Myers informed Plaintiff that they searched for an orthopedist to provide him with medical care, but they were unable to locate one. *Id*. at p. 104, 191-92.

On January 7, 2019, an LPN in NSC saw Plaintiff for complaints of left knee pain after a fall he had the previous day. The LPN noted that Plaintiff had braces on both knees, that the right knee had moderate swelling, and the left knee had mild swelling with no bruising or redness. The LPN referred him to a doctor. *Id*. at p. 107. Ten days later, Defendant Myers saw Plaintiff for the fall and injury to his left knee that he had sustained on January 6, 2019. Defendant Myers observed no appearance of swelling. He ordered x-rays of the left knee, prescribed Pamelor 25 mg for three months, instructed him to return to the clinic in two months, and prescribed compression stockings. *Id*. at p. 110.

Plaintiff's January 25, 2019 x-ray showed mild osteoarthritis of the knee joint and was stable since the prior study. It also showed no acute bony fracture, nor large joint infusion and no loose body. *Id*. at p. 284.

Based on his medical opinion, Defendant Myers found, at that time, that Plaintiff did not require any further diagnostic testing or specialist evaluation for his left knee. (Doc. 66-2, p. 12).

On February 1, 2019, an LPN in NSC saw Plaintiff for pain to both knees due to a fall. The LPN noted that his right knee could not bend and that his left knee had slight swelling. She also felt fluid and a soft, half-dollar size swelling with no discoloration. The LPN further noted that Plaintiff was able to bear weight. The LPN referred Plaintiff to a doctor. *Id*. at p. 113.

Plaintiff next saw Defendant Myers on February 7, 2019 for complaints of bilateral knee pain. Plaintiff also requested renewal of his pain medications. Defendant Myers noted a need to review the x-ray of the left knee. He also ordered that Plaintiff return to the clinic PRN. Finally, he renewed Plaintiff's prescriptions for Pamelor 50mg, Ultram 50mg, and Naprosyn 500mg for eight months. *Id*. at p. 115.

On February 28, 2019, Plaintiff saw orthopedic surgeon Myuibat A. Adelani, M.D. at the Washington University School of Medicine BJH Center for Advanced Medicine. Dr. Adelani evaluated Plaintiff and reviewed his x-rays. She found that Plaintiff had right knee ankylosis (abnormal stiffening and immobility of a joint due to fusion of the bones) following a previous patellar fracture. Her impression was the following:

> I reviewed the diagnosis and radiographs with the patient. I explained the prognosis following surgery is not clear; I would like to discuss that with some colleagues. Additionally, we would need to better understand what he would be able to do in prison with regards to rehab, including whether he would be able to have a CPM. I will follow up with the medical director of the prison and then arrange for patient to return to discuss.

*Id.* at p. 193-95.

Upon returning from the medical furlough with Dr. Adelani, Plaintiff saw Dr. Myers that same day. Plaintiff told Defendant Myers that he wanted surgery done on his right knee. At this time, Defendant Myers did not have any documentation from Dr. Adelani, so he referred Plaintiff to Collegial Review for surgical repair of the right knee to increase his flexibility. *Id.* at p. 121, 196; (Doc. 66-2, p. 13).

The next day, Defendant Myers noted in Plaintiff's chart that he was evaluated by Dr. Adelani and that she would meet with him to discuss Plaintiff's care. Dr. Adelani recommended intense post-operative PT and a CPM machine. Dr. Myers further noted the following: (1) that he will contact Dr. Adelani and ascertain if surgery was a possibility for Plaintiff and discuss with Dr. Adelani that a CPM may not be possible, and that Warden approval may require photos of the machine; (2) that he will inform Dr. Adelani that intense PT post-operative is very difficult in the prison setting; and (3) that he will discuss with Plaintiff after he speaks with Dr. Adelani whether Plaintiff still desires surgery, and the possibility of failure without the CPM machine and no PT. (Doc. 66-3, p. 123-24).

Subsequently, on March 7, 2019, Defendant Myers developed an alternate treatment plan in Collegial Review with Dr. Ritz to discuss with Dr. Adelani. Defendant Myers also informed Plaintiff that prior to approval of surgery, he needed to contact Dr. Adelani to discuss the results of her meeting with her colleagues. He also needed to obtain the picture of the CPM machine and discuss with the Warden whether it was possible to have the machine in prison. He further informed Plaintiff that the IDOC could

not provide the surgeon's suggested post-operative aggressive PT, which could result in surgical failure and worse functioning of the knee. *Id*. at p. 197.

Three days later, Plaintiff saw an LPN and requested a wheelchair due to his knee pain. The LPN noted that Plaintiff walked steadily with a cane. The LPN also noted that Plaintiff was currently in PT and that the physical therapist would refer him to receive a wheelchair if one was needed. The LPN further noted that Plaintiff had been seen by staff carrying his cane and not using it. *Id*. at p. 125. Thereafter, on March 12, 2019, it was documented that Plaintiff returned his walker because he was in an ADA cell with handrails. *Id*. at p. 126. Plaintiff testified that he was moved to an ADA cell on February 10, 2019. Doc. 66-1, p. 86.

On April 1, 2019, an LPN in NSC saw Plaintiff for left and right knee discomfort. Plaintiff stated that his right knee felt unstable and that he had bilateral knee pain. He also "felt a pop" in his knee. The LPN did not observe any swelling. The LPN provided Plaintiff with Acetaminophen and referred him to a physician. *Id*. at p. 134.

On April 12, 2019, the HCU received a letter from Dr. Adelani stating that after evaluating Plaintiff, reviewing his medical records, and discussing Plaintiff's situation with numerous colleagues, she did not think that surgical intervention was likely to provide Plaintiff a measurably different outcome. Dr. Adelani recommended continuing conservative measures of treatment. *Id*. at p. 199. The HCU provided Plaintiff with a copy of Dr. Adelani's letter. (Doc. 66-1, p. 91).

Plaintiff saw Dr. Myers again on April 15, 2019 for continued complaints of knee problems. Dr. Myers noted that Washington University Orthopedics determined that

Plaintiff was not a surgical candidate and recommended that Plaintiff continue with conservative measures of treatment. Dr. Myers explained to Plaintiff that he went to Washington University because no orthopedic surgeon in Southern Illinois would perform surgery and that Washington University was a definitive hospital. Dr. Myers further instructed Plaintiff to return to the clinic PRN and prescribed him Hydrocortisone cream. He additionally granted Plaintiff with an indefinite low bunk, low gallery, cane, and knee brace permits. (Doc. 66-3, p. 139).

On April 25, 2019, during Collegial Review, Dr. Myers and Dr. Fisher developed an alternative plan for continued conservative treatment measures. Dr. Myers withdrew the request for surgery due to Dr. Adelani's recommendations. *Id*. at p. 200; (Doc. 63-2, p. 16).

Three days later, Plaintiff saw an LPN in NSC for complaints of right knee pain and left ankle discomfort. The LPN observed normal range of motion, no swelling, and no open areas to the skin. The LPN referred Plaintiff to a doctor. (Doc. 66-3, p. 146).

On May 2, 2019, Dr. Myers saw Plaintiff after a fall. Dr. Myers observed wrappings and braces on the right knee but noted that both knees did not have swelling or bruising. Dr. Myers further noted that both knees had limited range of motion and that Plaintiff was in PT. Defendant Myers reviewed the PT chart, noted that Plaintiff was currently on three pain medications, and prescribed a topical cream for his complaints of leg pain. Defendant Myers did not feel an increase in his medications was warranted at the time. However, Defendant Myers ordered the following: (1) a permit for size 11 orthopedic shoes; (2) a permit for a back brace; (3) a call to the Warden's office to inform the Warden

that there was no medical hold and that Plaintiff could transfer; (4) a discussion with the physical therapist to determine if Plaintiff needed a different type of knee brace; (5) and instructions for Plaintiff to return to the clinic PRN. *Id*. at p. 147-48.

On May 6, 2019, Plaintiff saw an RN in NSC for complaints of right knee pain. The RN observed no swelling or bruising, normal range of motion, and no signs or symptoms or distress. The RN referred Plaintiff to the doctor and provided him with Acetaminophen. *Id*. at p. 149. Two days later, Plaintiff saw NP Dearmond for complaints of right knee pain. NP Dearmond noted that Plaintiff saw Defendant Myers on May 2, 2019. She noted no swelling or redness to either knee and that his last x-ray to his right knee showed no significant changes. She ordered Plaintiff to continue with his plan prior to the visit with no changes to his medications or equipment. *Id*. at p. 150.

On May 26, 2019, Plaintiff was seen by an LPN in NSC for complaints of right knee pain. The LPN observed no swelling, no bruising, and no grimacing with movement. She also noted that she watched Plaintiff walking on his wing with no cane in hand on May 25, 2019. The LPN did not refer Plaintiff to a physician. *Id*. at p. 153-54. The very next day, Plaintiff saw an RN in NSC complaining of right knee pain. The RN noted no signs of obvious discomfort, no swelling, and no bruising. She also noted that Plaintiff ambulated without difficulty and at times without a cane. The RN referred him to a doctor. *Id*. a p. 155.

On May 30, 2019, NP Blum saw Plaintiff. NP Blum observed Plaintiff's right knee was wrapped in an ace wrap, TED stockings, and a neoprene brace. He noted no redness and no swelling of the right knee. He ordered x-rays of both knees, prescribed Eucerin

cream, ordered a follow-up with the x-ray results, and instructed Plaintiff to obtain Motrin from the commissary. *Id*. at p. 156-57.

On June 4, 2019, the right knee x-ray showed mild osteoarthritis of all three compartments of the knee joint, but no boney fracture. The record indicated that instead of an x-ray of the left knee, an x-ray of the left ankle was performed. *Id*. at p. 157, 410.

A June 19, 2019 letter to Plaintiff from Dr. Adelani regarding Plaintiff's right knee reads as follows:

> Thank you for your letter. I discussed your case with other knee surgeons in my practice. I don't think it has a high chance of helping you reach your goals of more motion in the knee. It has been stiff for a long time, and I think that it would return to being stiff, even with the CPM machine and proper rehab. Therefore, I don't recommend surgery for you at this time.
> If you would like a second opinion, we can arrange that, with the help of the prison physician. Feel free to write back to let me know.

(Doc. 74, p. 41).

Plaintiff testified that he wrote Dr. Adelani back asking for another opinion. Dr. Adelani, however, did not send Plaintiff another letter after the June 19, 2019 letter. (Doc. 63-1, p. 165).

On June 20, 2019, Defendant Myers saw Plaintiff and reviewed the x-ray results with him. The right knee and the left ankle x-rays showed mild arthritis. Defendant Myers told Plaintiff that because the results were mild arthritis and that because he was currently taking anti-inflammatory medications and a strong pain medication, no other medications were needed. (Doc. 63-3, p. 160).

A grievance response dated August 22, 2019, stated that Defendant Myers discussed Plaintiff's case with several providers. Those providers concurred that a third

provider opinion would not be approved and that Plaintiff had been seen by two specialists, neither of whom agreed to operate. (Doc. 74, p. 42).

On August 26, 2019, Defendant Myers saw Plaintiff and renewed his Ultram 50mg prescription for eight months. He also ordered that it be crushed and floated. (Doc. 63-3, p. 292).

On September 4, 2019, Defendant Myers discontinued Pamelor for Plaintiff. He also prescribed Naprosyn 500mg to be taken twice a day, Nasacort spray, Eucerin cream, and a muscle rub for eight months. *Id*. at p. 300. Defendant Myers treated Plaintiff on October 3, 2019 and ordered bilateral leg sleeves and knee braces. He also prescribed hydrocortisone cream. *Id*. at p. 304.  Plaintiff saw Defendant Myers again on October 23, 2019 for complaints of knee and ankle pain. Defendant Myers indicated that he doubted if Plaintiff needed or would benefit from an immobilizer. Defendant Myers planned to contact PT to see if PT believed Plaintiff would benefit from a knee immobilizer for his right knee. *Id*. at p. 312.

 On November 4, 2019, Plaintiff was issued bilateral knee braces. *Id*. at p. 316.

On January 29, 2020, Plaintiff was provided with a right knee immobilizer brace. The PTA noted that periodic checks for brace integrity would be performed. *Id*. at p. 328.

Plaintiff filed the instant lawsuit on February 4, 2020. (Doc. 1).

On February 18, 2020, Defendant Myers noted in Plaintiff's chart that Ultram was on back order. He discontinued Ultram and documented that Plaintiff had an order for Naprosyn. (Doc. 63-3, p. 336). Three days later, Defendant Myers saw Plaintiff who

requested Ultram for his shoulder pain. Defendant Myers noted that Plaintiff had been evaluated by PT and that Plaintiff had function and was capable of activities of daily living. Defendant Myers ordered two knee sleeves, prescribed Cymbalta for six months, and ordered an x-ray for Plaintiff's left shoulder. *Id*. at p. 339-40.

On May 12, 2020, Defendant Myers renewed Plaintiff's Naprosyn prescription for six months. *Id*. at p. 365.

A week later, Plaintiff saw Defendant Myers for right knee pain and weakness. Defendant Myers indicated that Plaintiff has had multiple x-rays which showed mild arthritis and that Plaintiff had seen several specialists for his knee who determined that he was not a surgical candidate. Defendant Myers noted that Plaintiff had a knee brace, low bunk/low gallery permit, and a cane and that there was nothing else they could do. *Id*. at p. 368. Nine days later, Plaintiff saw Defendant Myers again after a fall due to knee instability. Plaintiff asked for a specialist or to have an MRI. Defendant Myers explained to Plaintiff that he had been evaluated by numerous specialists and that his knee was inoperable. Further, Defendant Myers explained that an MRI was fruitless because he had an inoperable knee. Defendant Myers, however, ordered an x-ray. *Id*. at p. 370.

On June 2, 2020, the right knee x-ray revealed post-surgical changes in the inferior pole of the patella and likely sequela of old prior patellar tendon repair. It also revealed that there were ossicles along the distal aspect and proximal aspect of the patellar tendon, which was chronic. The x-ray did not reveal evidence of an acute fracture or dislocation. However, there was a possible mild patellofemoral compartment degenerative change. *Id*. at p. 371, 411.

Next, Defendant Myers noted that he reviewed the right knee x-ray which showed no fracture or dislocation; he also ordered continued monitoring. *Id*. at p. 371. Thereafter, on July 23, 2020, Defendant Myers noted in Plaintiff's chart that he had seen Plaintiff on May 2, 2019 and that they discussed orthopedic shoes. He also noted that he discussed with Plaintiff that he did not meet the criteria for orthopedic shoes, but that he was provided a permit to wear the ones Plaintiff already had in his possession. Defendant Myers granted Plaintiff an indefinite permit to wear orthopedic shoes. *Id*. at p. 379.

Plaintiff has had a cane since 2008. Plaintiff's first knee brace was discontinued in 2008. Plaintiff testified that he was aware that besides placing or removing a medical hold, Defendant Myers had no authority over inmate transfers. (Doc. 63-1, p. 94). Plaintiff also testified that his claims regarding his right and left knee pain against Defendant Myers spanned from September 5, 2018 to June 19, 2019. *Id*. at p. 112, 13. Plaintiff has had no medical training.

LEGAL STANDARDS

**A.    Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014)(citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## B.   Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–653 (7th Cir. 2005)(quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (internal quotation marks omitted). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009)(stating that "deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail on such a claim, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *See Arnett v.*

*Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need. *See Arnett*, 658 F.3d at 750; *accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994)(violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either knowingly or recklessly disregarded it. *See Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) (citation omitted). Also, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference." *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (internal quotations and citations omitted).

C.    **ADA and RA**

In order to sustain a *prima facie* case of discrimination under both the ADA and the RA, a plaintiff must show: (1) that he suffers from a disability as defined in the statutes, (2) that he is qualified to participate in the program in question, and (3) that he was either

excluded from participating in or denied the benefit of that program based on his disability. *See Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). The RA further requires that a plaintiff show that the program in which he was involved received federal financial assistance. *Id*. at 810 n.2; *see also* 29 U.S.C. § 794(a); *Novak v. Bd. of Trustees of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015).

ANALYSIS

**A.     Deliberate Indifference Claims – Defendant Myers and Brown**

For the purposes of this motion and based on the extensive record before the Court, the Court finds that the injuries to both of Plaintiff's knees constitute objectively serious medical needs. However, based on that same record and construing the evidence in the light most favorable to Plaintiff, the Court finds that there is no evidence in the record to show that either Defendant Myers or Defendant Brown were deliberately indifferent to Plaintiff's serious medical needs regarding his knees.

As to Defendant Myers, the record reveals that Defendant Myers from late 2018 to 2020 (even after Plaintiff filed this lawsuit) provided appropriate continued medical treatment to Plaintiff. Defendant Myers routinely saw, examined, treated, and prescribed various medications and items. Defendant Myers on various occasions discussed Plaintiff's issues in Collegial Review and referred him to outside specialists. From September 2018 to June 2019 (the time frame Plaintiff testified his claims against Defendant Myers were based), the medical treatment simply was not the treatment Plaintiff wanted or demanded. That being said, Plaintiff still received a variety of treatment for his knees. Plaintiff received the following regarding both his knees:

- He was provided a plan and granted indefinite low bunk, low gallery, cane, knee brace permits, shower chair, walker and orthopedic shoes;

- He received physical therapy;

- He received knee sleeves;

- He received bilateral knee braces;

- He received multiple radiological imaging;

- He was sent to two outside doctors regarding both his knees;

- Defendant Myers reviewed the multiple radiological reports;

- Defendant Myers reviewed the notations of the examinations of both Dr. Davis and Dr. Adelani;

- Defendant Myers consulted with orthopedic surgeon Dr. Adelani about Plaintiff, and Plaintiff's case was discussed further with Dr. Adelani's colleagues.

The record demonstrates that outside orthopedic surgeon Dr. Adelani, after examining Plaintiff and discussing his case with her colleagues, determined that Plaintiff was not a surgical candidate for his right knee. Dr. Adelani also recommended that Plaintiff continue with conservative treatment measures. Further, Dr. Adelani determined that Plaintiff would not benefit from surgery. Defendant Myers after physically examining Plaintiff numerous times and reviewing his extensive medical records, determined that Plaintiff would not benefit from surgery on either knee. Indeed, it was perfectly reasonable to defer to Dr. Adelani's decision regarding surgery as she was an orthopedic specialist. Further, Plaintiff was never informed that his knee was fractured. Even construing the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could conclude that Dr. Myers was deliberately indifferent

to Plaintiff's serious medical needs regarding either knee.

Likewise, the Court finds that Plaintiff has not shown that Defendant Brown was deliberately indifferent to his serious medical needs as to his left knee. Prison officials, who are non-medical professionals, are entitled to rely upon the judgment of medical professionals to avoid liability under the Eighth Amendment. *See Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008). For example, the Seventh Circuit found that "as a layperson, the warden could rely on the medical staff's expertise as long as he did not ignore [an inmate] or his mistreatment." *Diggs v. Ghosh, et al.*, 850 F.3d 905, 911 (7th Cir. 2017).

As to Plaintiff's claim against Defendant Brown, the record reflects that she did not provide any medical care or treatment to Plaintiff. Further, the record reveals that Plaintiff continued to receive extensive and continued medical treatment after he filed his grievances. Again, as stated previously, Plaintiff was never informed that his left knee was fractured. Based on the circumstances of this case, it was reasonable for Defendant Brown to rely on the advice and treatment rendered by the medical professionals. Accordingly, no reasonable jury could find that Defendant Brown was deliberately indifferent to Plaintiff's medical needs regarding his left knee. Nor could any reasonable jury find that Defendant Brown ignored Plaintiff's medical concerns.

B.     **ADA/RA claim – Defendant Jeffreys**

The Court finds Jeffreys is also entitled to summary judgment on Plaintiff's ADA and RA claims.  Here, Plaintiff does not allege that he was denied any services or programs through the IDOC as result of his disability. Plaintiff has been provided a cane to ambulate since 2008. His claim that he should have been allowed to keep his

immobilizer is a denial of a medical device which can only be prescribed by a medical doctor. Thus, Plaintiff's claim against the IDOC does not rise to a violation of the ADA or RA.

CONCLUSION

Accordingly, the Court **GRANTS** the motions for summary judgment (Doc. 65, 68). The Court **FINDS** in favor of Percy Myers and Christine Brown and against Darren Wilson on Count 1, **FINDS** in favor of Percy Myers and against Darren Wilson on Count 2 and **FINDS** in favor of Rob Jeffreys and against Darren Wilson on Count 3. Further, the Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same and close the case.

**IT IS SO ORDERED**.

**DATED: May 25, 2022.**

Digitally signed by Judge Sison 2
Date: 2022.05.25 13:49:38 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**